J-A28014-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOHN AND DEBRA HOAGLAND | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JODY HOFFMASTER AND COUNTY | : | |
| LINE QUARRY, INC. | : | |
| | : | No. 572 MDA 2018 |
| | : | |
| APPEAL OF: JOHN HOAGLAND | : | |

Appeal from the Judgment Entered March 29, 2018
In the Court of Common Pleas of Lancaster County Civil Division at
No(s):  CI-14-01373

BEFORE:  LAZARUS, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    **FILED MARCH 07, 2019**

Appellant, John Hoagland, appeals from the judgment entered on March 29, 2018.  We affirm.

The trial court ably summarized the underlying facts and procedural posture of this case.  As the trial court explained:

> This case arises out of a motor vehicle accident which occurred on April 20, 2011, at the Prospect Road exit off Route 30 West in West Hempfield Township, Lancaster County, Pennsylvania.  At approximately 2:20 p.m., a [tri-axle dump truck, owned by Country Line Quarry, Inc. (hereinafter "Defendant CLQ") and driven by Defendant CLQ's employee, Jody Hoffmaster (hereinafter "Defendant Hoffmaster")], failed to completely stop before colliding with [Appellant's] vehicle[,] which was sitting at a red light at the end of the ramp.  While the exact speed of the truck was never determined, there were four large skid marks indicating that there was an attempt to stop the vehicle prior to the collision. . . .

Upon [arriving at] the scene, police took [Defendant] Hoffmaster into custody on suspicion of driving while intoxicated. Further testing revealed [that Defendant Hoffmaster had a] blood alcohol level of .292%. [Defendant] Hoffmaster acknowledged drinking [alcohol] and explained that he began [to do so] only after he left [Defendant] CLQ's premises. He was charged with, and subsequently pled guilty to, driving under the influence, highest rate of alcohol, and careless driving.[fn.1] The day after the accident [Defendant] Hoffmaster was fired by [Defendant] CLQ pursuant to their zero-tolerance drug and alcohol policy.

[fn.1. 75 Pa.C.S.A. §§ 3802(c) and 3714, respectively.]

On April 30, 2013, [Appellant] filed a Lancaster County suit against [Defendant Hoffmaster and Defendant CLQ (hereinafter, collectively, Defendants)]. Without explanation, [Appellant] withdrew that case and refiled in Philadelphia County against [Defendant] Hoffmaster, [Defendant] CLQ, and six other defendants. After two sets of preliminary objections, three complaints and ten months of litigation, [Appellant] voluntarily dismissed the six new defendants and[,] on February 21, 2014, the action against [Defendants] was transferred back to Lancaster County. In a second amended complaint, [Appellant] asserted a direct punitive damage claim against [Defendant] CLQ to which Defendant CLQ filed preliminary objections. On July 8, 2014, [the trial court] sustained the preliminary objections without prejudice and with the understanding that the [punitive damages] claim [against Defendant CLQ] could be reasserted should [Appellant] be able to produce any evidence that [Defendant] Hoffmaster was drinking at any time before he left [Defendant] CLQ's premises on the day of the accident. After over three years of discovery and investigation consisting of numerous interrogatories, depositions, and expert reports, and five days of trial[, Appellant] was not able to produce a scintilla of evidence to rebut [Defendant] Hoffmaster's consistent statements that he began drinking only after he left CLQ's premises. Without that evidence[, the trial court] was constrained to find that a punitive damage claim was not appropriate [against Defendant CLQ] in this case.

- 2 -

Apparently recognizing this flaw shortly before trial, [Appellant] tried a new theory[,] arguing that punitive damages were warranted because [Defendant] CLQ violated its employment policies on employee retention. In so claiming, [Appellant] relied heavily on the last-minute deposition of [Defendant] CLQ's Safety Director, Anthony Mangabat, who testified that he would have fired [Defendant Hoffmaster] in 2009 for three safety violations if he had had the authority to do so.[fn.2] Plaintiff also retained a "trucking expert" to claim that [Defendant] CLQ violated Federal Motor Carrier Safety Administration Regulations by not providing a sixty-minute reasonable suspicion training to supervisors. [The trial court] found these last-minute allegations to be wholly insufficient to support a claim for punitive damages under the facts of this case and denied [Appellant's] motion . . . without prejudice, again with the understanding that [the trial court] would entertain an oral motion to amend should any evidence that [Defendant] Hoffmaster began to consume alcohol at any time prior to leaving [Defendant CLQ's] premises on the day of the accident emerge.

> [fn.2.] The first violation occurred on March 18, 2009 as a result of [Defendant] Hoffmaster backing his truck into a tool box. The second violation occurred on June 18, 2009 after [Defendant] Hoffmaster operated his vehicle without functioning brake lights. He received a five-day suspension and returned to work. The third incident occurred on October 30, 2009[, when Defendant] Hoffmaster rear ended another vehicle after the other vehicle abruptly stopped mid turn in a four-way intersection. After each of these incidents [Defendant Hoffmaster] was tested for drugs and alcohol pursuant to company policy. The tests were negative, although the second test could not be produced at trial. While there was some discussion as to whether [Defendant Hoffmaster] should [have been] fired after the third violation, [Defendant] CLQ ultimately made the decision to retain [Defendant] Hoffmaster over Mr. Mangabat's suggestion that [Defendant Hoffmaster] be fired[,] and [Defendant Hoffmaster] continued to drive for [Defendant CLQ] after serving the five-day suspension.

The only testimony presented at trial relevant to the time at which [Defendant] Hoffmaster began to drink came from

- 3 -

Nelson Klinedinst, [Defendant] CLQ's Dispatcher and Weight Master, and [Defendant] Hoffmaster himself. Mr. Klinedinst was the only one to see [Defendant] Hoffmaster on the day of the accident. On that day, [Defendant] Hoffmaster picked up three separate loads of stone for delivery to [Defendant CLQ's] customers. Mr. Klinedinst explained that [Defendant] Hoffmaster appeared normal during each of the three interactions he had with him. He testified that during all three interactions [Defendant] Hoffmaster acted in his usual manner, his eyes were not bloodshot and glassy and [Mr. Klinedinst] did not detect an odor of alcohol on [Defendant Hoffmaster's] person.

Most telling of all was the testimony of [Defendant] Hoffmaster himself, who, as he had consistently and without exception in the six-and-a-half years since the accident, explained he only began drinking after he picked up the third load and left [Defendant CLQ's premises]. [Defendant] Hoffmaster testified that after receiving the third load of stone, he pulled his vehicle into the company parking lot, stepped out of the dump truck, and retrieved a bottle of rum from his personal vehicle. He was adamant that he began drinking from this bottle only after he left [Defendant] CLQ's property and continued to do so until the accident. Nonetheless, and without presenting any counter-factual evidence regarding when [Defendant] Hoffmaster began to drink, [Appellant] made an oral motion to reinstate the direct punitive damage claim [against Defendant CLQ,] which [the trial court] once again denied.

After five days of trial, on October 20, 2017, the jury awarded [Appellant] compensatory damages in the amount of $210,000 against both Defendants jointly and an award of $30,000 in punitive damages against [Defendant] Hoffmaster. The jury apportioned 75% liability to [Defendant] Hoffmaster and 25% liability to [Defendant] CLQ. On October 27, 2017, [Appellant] filed a post-trial motion with th[e trial] court for a new trial solely on the issue of punitive damages. Defendant CLQ and Defendant Hoffmaster filed timely responses to the motion and after oral argument on the motion [the trial court] denied [Appellant's] motion on March 12, 2018.

Trial Court Opinion, 6/29/18, at 1-5 (internal citations and emphasis and some internal capitalization and footnotes omitted).

On March 29, 2018, judgment was entered on the verdict. Appellant filed a timely notice of appeal and now raises the following claims to this Court:

A. Whether the trial [court] erred in refusing to instruct the jury that it could consider awarding punitive damages against Defendant CLQ.

1. Whether the evidence would have supported a finding by the jury that punitive damages against CLQ were warranted based on the CLQ's own conduct because CLQ's corporate designee/safety manager testified that Hoffmaster should have been fired due to three prior incidents, and was a "safety risk," but Hoffmaster was permitted to remain employed at CLQ because CLQ needed truck drivers more than it cared about safety.

2. Whether CLQ's admissions that it was required but failed to comply with the Federal Motor Vehicle Carrier Safety Regulations including section Sections 382.603 and 382.307, and CLQ's failure to train supervisors to determine reasonable suspicion of alcohol use supported punitive damages against CLQ.

3. Whether the testimony of Plaintiff's expert witness relating to CLQ's violations of federal regulations and its own policies supported punitive damages against CLQ.

4. Whether the trial court erred in restricting [Appellant's] ability to pursue punitive damages against CLQ to producing evidence that Defendant Hoffmaster was drinking on or before he left CLQ's premises on the day of the accident.

5. Whether the evidence would have supported a finding by the jury that CLQ was vicariously liable for punitive damages based on the conduct of its employee, Defendant Hoffmaster.

B. Whether the trial court erred in entering the order dated July 8, 2014, sustaining preliminary objections to [Appellant's] claim for punitive damages as to Defendant CLQ, and the orders of June 1, 2017 and October 6, 2017, refusing to reinstate that claim.

C. Whether the trial court erred granting in part Defendant's motion for protective order dated July 12, 2017, limiting [Appellant's] discovery and preventing him from deposing CLQ's owner at an earlier stage.

D. Whether the trial court erred in refusing to allow [Appellant] to subpoena CLQ's owner, Tony Depaul, to testify at trial as to why Mr. Hoffmaster was not terminated prior to the accident date.

E. Whether a new trial should be limited to punitive damages against CLQ when a new trial on all issues has not been requested by any party and would be prejudicial to all parties.

Appellant's Brief at 6-8 (some internal capitalization omitted).

We have reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinion of the able trial court judge, the Honorable Jeffery D. Wright. We conclude that Appellant is not entitled to relief in this case and that Judge Wright's June 29, 2018 opinion meticulously and accurately disposes of Appellant's issues on appeal. Therefore, we affirm on the basis of Judge Wright's thorough opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Wright's June 29, 2018 opinion.

Judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/07/2019

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

JOHN HOAGLAND               :
                                   :
          vs.                  :        CI-14-01373
                                     :
JODY HOFFMASTER and     :
COUNTY LINE QUARRY, INC.    :

## OPINION

BY: WRIGHT, J.                                        June _28_, 2018

This Opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure. John Hoagland, Plaintiff, appeals from this Court's March 12, 2018 Order denying his Motion for a New Trial and asserts eight issues in his Statement of Errors. Plaintiff's primary challenge is to the denial of a direct punitive damage claim against County Line Quarry (hereinafter "CLQ"). A review of the record and applicable law will demonstrate that punitive damages were not warranted in this case and Plaintiff's appeal should therefore be dismissed.

## BACKGROUND

This case arises out of a motor vehicle accident which occurred on April 20, 2011, at the Prospect Road exit off Route 30 West in West Hempfield Township, Lancaster County, Pennsylvania. (Third Amended Complaint at ¶ 7). At approximately 2:20 P.M., a CLQ tri-axle dump truck being driven by Defendant Jody Hoffmaster, failed to completely stop before colliding with Plaintiff's vehicle which was sitting at a red light at the end of the ramp. (Notes of Testimony, Jury Trial, 10/16/18-10/20/18 at 203 (hereinafter "N.T."). While the exact speed of the truck was never determined, there were four large skid marks indicating that there was an attempt to stop the vehicle prior

to the collision. Id. at 208. Upon arrival of the scene, police took Mr. Hoffmaster into custody on suspicion of driving while intoxicated. Id. at 205. Further testing revealed a blood alcohol level of .292%. Id. at 610. Mr. Hoffmaster acknowledged drinking and explained that he began only after he left CLQ's premises. Id. at 611, 615. He was charged with, and subsequently pled guilty to, driving under the influence, highest rate of alcohol,[1] and careless driving.[2] Id. at 611. The day after the accident Mr. Hoffmaster was fired by CLQ pursuant to their zero-tolerance drug and alcohol policy. Id. at 626.

On April 30, 2013, Plaintiff filed a Lancaster County suit against Mr. Hoffmaster and CLQ. Without explanation, Plaintiff withdrew that case and refiled in Philadelphia County against Mr. Hoffmaster, CLQ, and six other defendants. After two sets of Preliminary Objections, three Complaints and ten months of litigation, Plaintiff voluntarily dismissed the six new defendants and on February 21, 2014, the action against Mr. Hoffmaster and CLQ was transferred back to Lancaster County. In a Second Amended Complaint, Plaintiff asserted a direct punitive damage claim against CLQ to which Defendant CLQ filed Preliminary Objections. On July 8, 2014, I sustained the Preliminary Objections without prejudice and with the understanding that the claim could be reasserted should Plaintiff be able to produce any evidence that Mr. Hoffmaster was drinking at any time before he left CLQ's premises on the day of the accident. After over three years of discovery and investigation consisting of numerous interrogatories, depositions, and expert reports, and five days of trial Plaintiff was not able to produce a scintilla of evidence to rebut Mr. Hoffmaster's consistent statements that he began

---

[1] 75 Pa. C. S. A. § 3802 (c).
[2] 75 Pa. C. S. A. § 3714.

drinking only after he left CLQ's premises.[3] Without that evidence I was constrained to find that a punitive damage claim was not appropriate in this case.

Apparently recognizing this flaw shortly before trial, Plaintiff, tried a new theory arguing that punitive damages were warranted because CLQ violated its employment policies on employee retention. In so claiming, Plaintiff relied heavily on the last-minute deposition of CLQ's Safety Director, Anthony Mangabat, who testified that he would have fired Mr. Hoagland in 2009 for three safety violations if he had had the authority to do so.[4] Plaintiff also retained a "trucking expert" to claim that CLQ violated Federal Motor Carrier Safety Administration Regulations by not providing a sixty-minute reasonable suspicion training to supervisors. I found these last-minute allegations to be wholly insufficient to support a claim for punitive damages under the facts of this case and denied Plaintiff's Motion for the same without prejudice, again with the understanding that I would entertain an oral Motion to Amend should any evidence that Mr. Hoffmaster began to consume alcohol at any time prior to leaving CLQ premises on the day of the accident emerge.

---

[3] Indeed, less than three months before the scheduled trial, Plaintiff went so far as to subpoena, without prior Court approval, seventeen years of Defendant Hoffmaster's HIPAA protected medical records. When counsel for Defendant Hoffmaster objected, Plaintiff argued the records were necessary for the purpose of impeaching Defendant's testimony that he had never sought any drug or alcohol counseling. Although this was a blatantly transparent attempt to find information Plaintiff *hoped* existed, I nonetheless permitted the records to be produced initially for an *in camera* inspection. Not surprisingly, there was nothing in the records so produced which was in any way relevant to this case.

[4] The first violation occurred on March 18, 2009 as a result of Mr. Hoffmaster backing his truck into a tool box. Id. at 142. The second violation occurred on June 18, 2009 after Mr. Hoffmaster operated his vehicle without functioning brake lights. Id. at 143. He received a five-day suspension and returned to work. Id. at 144. The third incident occurred on October 30, 2009 in which Mr. Hoffmaster rear ended another vehicle after the other vehicle abruptly stopped mid turn in a four-way intersection. Id. at 145. After each of these incidents he was tested for drugs and alcohol pursuant to company policy. The tests were negative, although the second test could not be produced at trial. Id. at 193-195, 600. While there was some discussion as to whether he should be fired after the third violation, CLQ ultimately made the decision to retain Mr. Hoffmaster over Mr. Mangabat's suggestion that he be fired and he continued to drive for them after serving the five-day suspension. Id. at 430.

3

The only testimony presented at trial relevant to the time at which Mr. Hoffmaster began to drink came from Nelson Klinedinst, CLQ's Dispatcher and Weight Master, and Mr. Hoffmaster himself. Mr. Klinedinst was the only one to see Mr. Hoffmaster on the day of the accident. Id. at 511. On that day, Mr. Hoffmaster picked up three separate loads of stone for delivery to CLQ customers. Id. at 803. Mr. Klinedinst explained that Mr. Hoffmaster appeared normal during each of the three interactions he had with him. Id. at 803, 804. He testified that during all three interactions Mr. Hoffmaster acted in his usual manner, his eyes were not bloodshot and glassy and he did not detect an odor of alcohol on his person. Id. at 805-807.

Most telling of all was the testimony of Mr. Hoffmaster himself, who, as he had consistently and without exception in the six-and-a-half years since the accident, explained he only began drinking <u>after</u> he picked up the third load and left CLQ. Mr. Hoffmaster testified that after receiving the third load of stone, he pulled his vehicle into the company parking lot, stepped out of the dump truck, and retrieved a bottle of rum from his personal vehicle. Id. at 614. He was adamant that he began drinking from this bottle only <u>after</u> he left CLQ's property and continued to do so until the accident. Id. at 615. Nonetheless, and without presenting any counter-factual evidence regarding when Mr. Hoffmaster began to drink, Plaintiff made an oral Motion to reinstate the direct punitive damage claim which I once again denied. Id. at 526.

After five days of trial, on October 20, 2017, the jury awarded Plaintiff compensatory damages in the amount of $210,000 against both Defendants jointly and an award of $30,000 in punitive damages against Mr. Hoffmaster. Id. at 934-935. The jury apportioned 75% liability to Mr. Hoffmaster and 25% liability to CLQ. Id. at 934. On

4

October 27, 2017, Plaintiff filed a post-trial motion with this Court for a new trial solely on the issue of punitive damages. Defendant CLQ and Defendant Hoffmaster filed timely responses to the Motion and after oral argument on the motion I denied Plaintiff's Motion on March 12, 2018. Plaintiff filed an appeal of that Order on April 6, 2018.

## ANALYSIS

The primary focus of Plaintiff's appeal is whether direct punitive damages were warranted against CLQ when there was a complete absence of any evidence of any type that Mr. Hoffmaster was intoxicated or even consumed any alcohol on their premises. I will first discuss why direct punitive damages were not warranted in this case and in doing so will address issues one, two, three, four, and eight of Plaintiff's Statement of Errors. I will then address Plaintiff's fifth issue regarding the alleged vicarious liability of CLQ and Plaintiff's sixth issue regarding my July 12, 2017 Protective Order. Finally, I will address Plaintiff's seventh issue regarding the request to subpoena Tony DePaul.

## Punitive Damages

It is well settled under Pennsylvania law that "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk" Hutchison ex rel. Hutchison v. Luddy, 896 A.2d 1260, 1266 (Pa. Super. Ct. 2006). The "purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct." Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800, 803 (Pa. 1989); However, it must also be recognized that it is "impossible to deter

5

a person from taking risky action if he is not conscious of the risk." Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) *quoting* Martin v. Johns–Manville Corp., 494 A.2d 1088, 1097 n. 12 (Pa. 1985) (plurality opinion overruled on other grounds).

It has never been contested that punitive damages against Mr. Hoffmaster were appropriate. Focht v. Rabada, 268 A.2d 157, 161 (Pa. Super. Ct. 1970) ("under the appropriate circumstances, evidence of driving while under the influence of intoxicating liquors may constitute a sufficient ground for allowing punitive damages.") However, for an employer to be held directly liable for punitive damages they must also act in some manner that demonstrates outrageous conduct which goes beyond mere negligence. Dillow v. Myers, 916 A.2d 698, 702 (Pa. Super. Ct. 2007) (punitive damages were appropriate against employer who allowed a truck to go out on the road that was unable to properly distribute the weight of its load due to a broken loading rack) *see also* Darden-Munsell v. Dutch Maid Logistics, No. CA 10-103, 2011 WL 3325863, at *3 (W.D. Pa. July 13, 2011), report and recommendation adopted, No. CIV.A. 10-103, 2011 WL 3299087 (W.D. Pa. Aug. 2, 2011) (Federal Court applying PA law finding that a pleading of punitive damages was appropriate when it was alleged that employer knew that the driver had been driving over the hour limit, that the truck was negligently overloaded, and had not appropriately trained the driver).

Here, Plaintiff's repeated attempts to impose direct punitive damages against CLQ were not supported in law or fact. Based on the uncontroverted record that Mr. Hoffmaster did not obtain the alcohol or begin drinking until *after* he left CLQ's property, there is no way CLQ could have had a subjective appreciation of any risk of harm in

6

allowing Mr. Hoffmaster to deliver the third load of stone on the day of the accident. It was entirely unforeseeable that an employee who had no documented history of alcohol abuse, no positive random drug screens,[5] no criminal history related to driving while intoxicated, and who did not display any signs of intoxication prior to leaving the company premises would consume alcohol en route to his destination. It is inconceivable what deterrence purpose would be served in punishing a company for failing to see that which is invisible. CLQ did not have the opportunity to either appreciate the risk nor did it act "in conscious disregard of that risk" so as to justify a claim of direct punitive damages.

Nevertheless, I will address Plaintiff's three assertions which they claim should have been the basis for punitive damages. First, that CLQ failed to train employees like Mr. Klinedinst in reasonable suspicion training; second, that the jury could have disbelieved that Mr. Hoffmaster could have begun drinking prior to leaving CLQ's premises; and, third, that Mr. Hoffmaster was retained by CLQ despite three prior safety violations.

Plaintiff's first assertion was that CLQ's failure to provide reasonable suspicion training to their employees was so outrageous as to warrant punitive damages. The Weight Master and Dispatcher on duty that day for CLQ, Nelson Klinedinst, was the only employee to have interactions with Mr. Hoffmaster. Plaintiff's trucking expert, Jon Paul Dillard, testified that, Mr. Klinedinst, as a dispatcher was required by Federal regulations to undergo a sixty-minute reasonable suspicion training, but had not. Id. at 567. The glaring flaw in this argument is that the only evidence ever presented was that

---

[5] Id. at 600.

Mr. Hoffmaster did not begin drinking until after he left the CLQ's premises.[6] In other words, there was nothing even the best trained reasonable suspicion investigator could have or would have observed before any alcohol was consumed.

Plaintiff's second assertion is that the jury could have disbelieved Mr. Hoffmaster as to when he started drinking. While the role of the jury is to be the fact finder, "the trial judge must determine whether the plaintiff has presented sufficient evidence to support a punitive damages claim, i.e., facts from which the jury might reasonably conclude that the preponderance of the evidence establishes outrageous conduct by the defendant" Martin, 494 A.2d at 1098; see also Smith v. Bell Tel. Co. of Pa., 153 A.2d 477, 479 (Pa. 1959)("the evidence presented must be such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by plaintiff, and not that that conclusion must be the only one which logically can be reached").

In this case, Mr. Hoffmaster's narrative of the events of that day have remained unchanged in the six-and-a-half years since the accident in question. Through depositions, interrogatories, and the passage of time, his story has remained entirely consistent. His testimony is corroborated by Mr. Klinedinst's testimony that Hoffmaster displayed no evidence of intoxication while on CLQ's premises. Plaintiff did not present any evidence at trial that conflicted with the narrative of these two witnesses. Without any counter-factual evidence, any finding by the jury that Mr. Hoffmaster began drinking while on CLQ's premises would be based purely on speculation. Accordingly, I found that Plaintiff did not present sufficient evidence to support a punitive damage claim.

---

[6] Plaintiff also fails to mention that the preceding section in the Federal Motor Carrier Safety Administration Regulations states that reasonable suspicion must be based on, "specific, contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the driver" 49 C.F.R. § §382.307(b), of which Plaintiff has failed to produce any evidence.

8

Apparently recognizing the absence of any legitimate punitive damage claim relating to the alcohol consumption, late in the case Plaintiff altered his focus to an allegation that the decision to retain Mr. Hoffmaster after the three safety violations in 2009 was so outrageous conduct as to warrant punitive damages. [7] None of these incidents involved any allegation of intoxication and CLQ appropriately reprimanded Mr. Hoffmaster pursuant to company policy. While incidents like backing over a tool box may allude to a pattern of carelessness by Mr. Hoffmaster, they certainly do not demonstrate that he acted with an intentional disregard for others' safety like that which ultimately occurred in this case. The violations in 2009 and the case at bar are so separated by time, nature of the act, and intent of the act, such that CLQ could not have possibly foreseen that this incident would occur. The nexus between the safety violations in question and Mr. Hoffmaster's operation of a company vehicle while intoxicated two years later simply does not exist and the lack of evidence regarding CLQ's bad motive or conscious disregard of the risk in this case rendered a direct punitive damages claim unwarranted.

That is not to say that the decision to retain Mr. Hoffmaster was not in some way negligent. CLQ's decision to retain Mr. Hoffmaster after the third violation may have been inappropriate. Accordingly, the jury was properly instructed on negligent hiring, supervision, and retention and indeed the jury did find CLQ to be 25% liable. However, mere negligence without a demonstration of something more cannot give rise to punitive damages. see e.g. Phillips v. Cricket Lighters, 883 A.2d 439, 447 (Pa. 2005)

---

[7] See Footnote 3.

9

## Vicarious Liability

Plaintiff next claims that I erred in failing to instruct the jury that CLQ was "subject to the payment of punitive damages based on the reckless conduct of their employee." Exactly what he is arguing in this regard is far from clear in his Statement of Errors. Accordingly, I am left to try to divine what is meant. The language he uses, coupled with his heavy reliance on Butterfield v. Giuntoli, 670 A.2d 646, 655 (Pa. Super. Ct. 1995) (subrogation claim by an insurance company seeking indemnification from the responsibility to pay punitive damages assessed against the insured employer), leads me to believe that Plaintiff is claiming that CLQ is responsible for paying the punitive damages assessed against Mr. Hoffmaster. To my knowledge that is a non-issue as Defendant CLQ has already tendered payment of the entire judgment, including punitive damages awarded against Mr. Hoffmaster.[8] CLQ may be vicariously liable, and therefore responsible, for Mr. Hoffmaster's $30,000 punitive damages apportionment, but under Butterfield, that is a coverage issue that neither I, nor the jury, need have addressed. Accordingly, this issue should be dismissed.

It is possible, but by no means clear, that Plaintiff is challenging my decision not to instruct the jury on independent punitive damages against CLQ on a theory of vicarious liability. If this is the case, the analysis is quite different, but once again demonstrates that no such claim was warranted in this case.

While an employer can be vicariously liable for the harm caused by his employee to a third party, the employee must be acting within the scope of his employment. Costa

---

[8] Parenthetically, Mr. Hoagland has refused to accept this tender.

<u>v. Roxborough Mem'l Hosp.</u>, 708 A.2d 490, 493 (Pa. Super. Ct. 1998). The Restatement (Second) of Agency defines conduct within the scope of employment as follows:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>   (a) it is of the kind he is employed to perform;
>   (b) it occurs substantially within the authorized time and space limits;
>   (c) it is actuated, at least in part, by a purpose to serve the master, and
>   (d) if force is intentionally used by the servant against another, the use of the force is not unexpectable by the master.
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

Restatement (Second) of Agency, § 228

Moreover, "a master is not liable for the willful misconduct of his servant, and that such willful misconduct, while it may be within the course of the employment, is not within the scope thereof." <u>McMaster v. Reale</u>, 110 A.2d 831, 832 (Pa. Super. Ct.1955) *quoting* <u>MacPhail v. Pinkerton's National Detective Agency, Inc.</u>, 3 A.2d 968, 970 (Pa. Super. Ct.); *see also* <u>Fitzgerald v. McCutcheon</u>, 410 A.2d 1270, 1272 (Pa. Super. Ct. 1979) ("act was so outrageous, so criminal, and so incapable of anticipation by his employer, that it must be held as a matter of law to exceed the scope of [employees] employment").

Here, Mr. Hoffmaster's conduct was indeed so outrageous, criminal, and incapable of anticipation by CLQ that it must be held as a matter of law to exceed the scope of his employment. Drinking to a point of intoxication that was almost four times the legal limit for non-commercial drivers and fourteen times the legal limit for commercial drivers was manifestly beyond CLQ's expectations for their drivers. Even though Mr. Hoffmaster was driving his third load of stone and, therefore, may have been acting within the *course* of his employment he certainly was not acting within the *scope*

11

not raise this issue in his Motion for a New Trial, I consider this issue waived as well, even if it had been preserved, it too lacks merit.

In his effort to establish that there was some outrageous or illicit motive behind CLQ's decision to retain Mr. Hoffmaster so as to justify a claim for punitive damages, Plaintiff called CLQ's Safety Manager, Eric Snowadzky, as on cross. Mr. Snowadzky testified, just as he had at his deposition only weeks before, that the decision to retain Mr. Hoffmaster was made by Tony DePaul, part owner of the DePaul Group which manages CLQ. Despite years of litigation and for reasons never disclosed, Plaintiff never sought to depose Mr. DePaul, nor made any other effort to learn his reasons for retaining this employee. Apparently (and belatedly), realizing that oversight was fatal to his effort to show evil motive, Plaintiff sought to subpoena him on the third day of trial.

The error of that, however, was that Mr. DePaul was never identified as a potential witness in his Pretrial Memo or in any other pretrial documents.[9] Under the Rules of Civil Procedure, pretrial statements must contain a list of all witnesses to be called at trial. Pa.R.C.P. No. 212.2 (emphasis added). "Ultimately the most critical factors are the importance of the witnesses' testimony balanced against the prejudice that would be imputed to the other party." Feingold v. SEPTA, 517 A.2d 1270, 1273 (Pa. 1986).

If this testimony was so critical to his case, Plaintiff had no legitimate excuse for not recognizing that fact and properly putting the parties and this Court on notice of this potential witness. I found that the proposed last minute surprise subpoena created

---

[9] Mr. DePaul was not listed as a potential witness in Defendants' Pretrial Memos either.

13

prejudice to the Defendants that greatly outweighed the limited importance of why Mr. Hoffmaster was retained after the safety violations.

In an effort to circumvent these limitations, Plaintiff disingenuously claimed that he was exempt from the pretrial memo limitation because he was calling Mr. DePaul as a "rebuttal witness." The fallacy of that argument is that Mr. DePaul's proposed testimony was "rebutting" nothing. Plaintiff called Mr. Snowadzky in his own case in chief, knowing exactly what he would testify to. Mr. DePaul's testimony on the other hand, would not be "answering new matter" introduced by the defense, but rather, it would be to fill in the gaps of Plaintiff's own case in chief. That is not the purpose of rebuttal testimony. Mr. DePaul's testimony was properly excluded from trial and Plaintiff's appeal on this issue should be dismissed.

## CONCLUSION

Because there was absolutely no credible evidence that CLQ could have appreciated the risk of harm by allowing Mr. Hoffmaster to drive on the day of the accident, any claim for punitive damages, direct or vicarious, was not appropriate in this case. Therefore, Plaintiff's appeal should be dismissed.

In the event, however, that it is determined that this case should be remanded for a trial on punitive damages against the CLQ, it is my request and recommendation that the remanded matter would be for a retrial on _all_ of the issues. Aside from the fact that the question of punitive damages is inextricably intertwined with the jury's evaluations of the amount of compensatory damages. See e.g. BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 581 (1996); Kirkbride, 555 A.2d at 802, a new trial on the compensatory damages is warranted to address any injustice that may have resulted

14

from Plaintiff counsel's repeated misconduct during the trial. I will outline some of the more egregious examples.

On the third day of the trial, Plaintiff called Mr. Hoffmaster as on cross. After his initial questioning and that of defense counsel, on re-cross examination, Plaintiff's counsel asked questions which elicited answers revealing the existence of liability insurance in violation of Pa.R.E. 411.

> Q: Okay. Now, you were asked a question about, was my client's property damage, his damage to his car paid for, and your answer was yes, correct?
>
> A: Yes.
>
> Q: Now, there's no claim because we're not making a claim for that in this lawsuit. Do you know who paid it?
>
> A: County Line's insurance.
>
> N.T. at 648.

Defense counsel immediately objected claiming, among other things, that the question was "deliberately improper". Id. Had I so concluded, a mistrial was required. see e.g. Trimble v. Merloe, 197 A.2d 457 (Pa. 1964). At this point, however, I decided to give Plaintiff's counsel the benefit of the doubt and simply gave a curative instruction.[10] In light of the subsequent conduct of Plaintiff's counsel, I am constrained to believe that this misconduct was indeed deliberate. I nonetheless, and perhaps erroneously, allowed the trial to continue.

While Plaintiff's counsel sought to excuse the reference to insurance as unexpectedly given or inadvertently solicited, the same cannot be said about this next action which occurred on the following day. Specifically, while Plaintiff was being

---

[10] Ironically, Plaintiff's counsel later claimed that even the curative instruction was in error, disingenuously arguing that it was the witness's own fault for answering the question. N.T. at 657; 821.

questioned on direct examination, counsel directly and deliberately violated Pa.R.E. 408 as follows:

> Q: You also heard earlier that -- during the opening of Mr. Hoffmaster's counsel, that they know you were hurt and they think that you should be compensated. If they had compensated you fairly or offered to compensate you fairly, would you be here today?
>
> A: No.
>
> N.T. at 742.

There could be no legitimate claim of surprise or inadvertence or any possible explanation for such a clear violation of the law. Although once again a curative instruction was given, the effect of this ongoing improper conduct continued to accumulate.

Finally, prior to closing arguments, the parties submitted and I ruled on proposed points for charge. In his submission, Plaintiff included a series of points requesting that the jury be charged that, in addition to making a victim whole, compensatory damages included punishing the wrongdoer as a means of deterring future conduct. Id. at 827. These points were denied for obvious reasons.[11]

At a subsequent on the record points conference, I repeated my ruling that the Plaintiff may not argue for punishment or deterrence in his compensatory damages claim. Id. at 827. Plaintiff's counsel reiterated his understanding of this limitation by repeatedly asking to preserve his objection to my ruling on this point. Id. at 837, 878.

---

[11] "Compensatory damages are awarded to a person as compensation for harm sustained and are designed to give the injured person some pecuniary return for what he suffered or is likely to suffer." Restatement (2nd) of Torts, Section 903, comment [a]. Punitive damages, by contrast, are damages other than compensatory damages, awarded against a party to punish them for outrageous conduct and to deter them, and others like them, from similar conduct in the future. Restatement (Second) of Torts, Section 908 (1). Indeed, the fundamental purpose of punitive damages is to deter future outrageous conduct. Hutchinson, 896 A.2d at 1266.

16

Despite what appeared to be a very clear understanding of the limitations that this Court had imposed upon him, Plaintiff's counsel nonetheless proceeded to spend a considerable portion of his closing argument directly and repeatedly violating this ruling, demanding a verdict "...so large that every company in this county, in this state, will read about it" telling the jury that they are the "...voice of the community, and as the conscience of the community [they] set the standards in the community. Id. at 900-901. Perhaps most outrageous of all was his conclusion that if they don't give a large verdict "...what happens? If you don't, all these companies are going to cut corners. They're going to create a safety risk. They're going to make more money – I'd suggest whatever amount you give here, even if [Plaintiff] is made wealthy by your verdict – if you don't, every company in Lancaster County, in York County, Montgomery County, Chester County, in Pennsylvania and around are going to be a heck of a lot richer. Corporate greed is prevalent. And, again, you need to decide what you think is appropriate and fair for this community." Id. at 901.

These are but three of the most notable examples of Plaintiff's counsel's misconduct throughout the course of this case.[12] Indeed, in the decade that I have been a Common Pleas judge, I have presided over dozens of criminal and civil jury trials and hundreds of other hearings and yet, I cannot recall any instance with an attorney showing more discourtesy to opposing counsel or more deliberate disregard for the rulings and authority of this Court. There is, however, no way to precisely determine

---

[12] Other examples include subpoenaing witnesses without notice to opposing counsel (N.T. at 16, 27), providing previously unknown medical records of Plaintiff the Friday before trial (N.T. at 14), asking a question regarding attorney/client privilege (N.T. at 630), attempting to introduce new evidence and witnesses three weeks before trial (Plaintiff Second Amended Pretrial Memo), and improperly inflating his request for delay damages. (Plaintiff's Motion to Mold Jury Verdict to Include Delay Damages, 10/26/17; Order 3/15/18 FN. 2).

the cumulative effect this behavior had on the ultimate compensatory damages award. Accordingly, the only way to be sure that no improper benefit was conferred is to retry the entire case in the event of a remand.